Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 10 2014, 9:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RUTH JOHNSON**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana
Indianapolis, Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENT-CHILD RELATIONSHIP OF D.C. & A.R. (Minor Children), | ) ) ) ) |
| and | ) ) |
| T.R. (Mother) | ) ) |
| Appellant, | ) ) No. 49A05-1306-JT-291 |
| vs. | ) ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee. | ) |

APPEAL FROM THE SUPERIOR COURT OF MARION COUNTY
The Honorable Marilyn Moores, Judge
The Honorable Larry E. Bradley, Magistrate
Cause No. 49D09-1301-JT-68

**January 10, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

T.R.'s ("Mother") parental rights to her two youngest children were terminated by the Marion Superior Court. Mother appeals and argues that the evidence was insufficient to support the trial court's termination of her parental rights.

We affirm.

**Facts and Procedural History**

Mother has five children. Mother's first child died of Sudden Infant Death Syndrome when he was two months old. The second child lives with her paternal grandmother in Florida, and that grandmother has established a guardianship over the child. Mother's third child was removed from Mother in 2007 due to allegations of abuse and an unsafe home. Mother consented to the termination of her parental rights to her third child, and that child was adopted by the child's great aunt and uncle. This case involves Mother's fourth and fifth children; D.C., who was born in 2008 and A.R., who was born in 2009.

Prior to November 2010, Mother frequently asked a friend, Kristina Fairbairn, to babysit D.C. and A.R. Fairbairn would care for the children for long periods of time during which Mother did not even provide for the children's most basic needs, such as supplying her friend with diapers and formula. In the Fall of 2010, Mother left the

children with Fairbairn for an extended period of time, and Fairbairn eventually contacted the Department of Child Services ("the DCS") because she could no longer provide for the children and could not locate Mother.

A petition alleging that the children were in need of services ("CHINS") was filed on November 1, 2010. At that time the children were placed with a foster family. Mother finally appeared for an initial hearing in May 2011, but did not appear at the CHINS fact-finding hearing or the September 6, 2011 disposition hearing. Mother did not participate in the CHINS proceedings at all until February 21, 2012, and did not see D.C. and A.R. until March 2012.

On January 2, 2013, the DCS filed a petition to terminate Mother's parental rights to D.C. and A.R.[1] The trial court held a hearing on the petition on May 6 and May 9, 2013. Shortly thereafter, the trial court entered the following findings of fact and conclusions of law terminating Mother's parental rights to the children:

> 7. [Mother] did not participate in the CHINS matter, including visitation, from May 2011 until March of 2012.
> 8. Once reappearing in the CHINS case, [Mother] commenced home based services from May of 2012 until the present. Services include therapy and case management.
> 9. [Mother] consistently participated in the home based services.
> 10. Visitation with the children started in March of 2012 and continues weekly. Visitation has always been supervised.
> 11. [Mother] has consistently participated in visitation.
> 12. Instability was a concern as [Mother] was not gainfully employed and lacked housing.
> 13. [Mother] obtained housing in mid 2012. The housing is appropriate for the children.

---

[1] The children were born during Mother's marriage to J.R. But S.C. was later determined to be the biological father of both children. His parental rights were terminated as well and he does not appeal that judgment.

3

14. [Mother] receives minimal income from a part time job at Edwardian Graphics and babysitting. She also receives food stamps and her housing is partly subsidized through HUD.

15. [Mother] has a major support system in her fiancé [F.S.] who resides with her.

\*\*\*

17. [Mother] completed at least one court ordered psychological evaluation. No additional recommendations were made.

18. [Mother] received a parenting class completion certificate in February 2013.

19. Two major concerns during the CHINS case [were Mother's] ability to safely and appropriately parent due to experience during her childhood, and the existence of a secure bond between [Mother] and the children due to total lack of contact between October 2010 to March 2012.

20. Prior to the CHINS filing in November 2010, the children were periodically left with a babysitter for extended periods of time.

21. Jennifer Phoenix provided therapy for [Mother] from May of 2012 until sometime in November of 2012, three to four times per month. Although [Mother] participated in every session, she was marginally engaged.

22. At the time of trial, Ms. Phoenix questioned whether [Mother] could safely parent due to the intense anger and lack of empathy she observed.

23. Ms. Phoenix believed that [Mother's] history of childhood abuse and neglect may have contributed to the early stopping of an emotional development, resulting in the observed lack of empathy toward others.

24. Ms. Phoenix did not sense that [Mother] was changing during therapy, that she failed to understand the safety concerns for the children, and that to overcome her lack of empathy could take years and proper motivation.

25. Midtown Clinician Amy Earl began therapy with [D.C.] in September 2011 to address behavior problems. In June of 2012, she provided family therapy with [Mother] and the children into March of 2013.

26. Due to the lack of contact between [Mother] and her children, significant repair work was needed to reestablish a bond as a healthy and secure attachment.

27. [Mother] did not understand the bonding problem, and lacked the effort to engage and interact.

28. On November 19th and 20th 2012, bonding and attachment assessments were performed on [Mother] and the pre-adoptive foster parents by Gloria Hood.

29. In observing the children with their mother and foster parents, Ms. Hood was concerned that there appeared to be an insecure bond with [Mother]. She also concluded that the children bonded with the foster parents, and their biological sons, in a secure way, having a significant attachment.

4

30. Ms. Hood also had concerns regarding [Mother] safely parenting given her history of trauma and how she related to issues of sexual molestation, being absent from the children, and domestic violence.

31. Ms. Hood observed some anxiety and fear when observing the children with their mother.

32. Since the bonding and attachment assessments, [Mother] engaged with home based therapist Jennifer Davis who believed that [Mother] had the appropriate skills to parent and should have unsupervised visitation, contrary to the opinions given by two previous therapists, and the family clinician.

33. During three visitation sessions, Ms. Davis testified she saw some bond emerging but felt additional time was needed to assess if the bond was secure or insecure.

34. When presented with Ms. Davis' reports, Clinician Amy Earl did not see teh one on one engagement needed.

35. In 2012, prior to the bonding and attachment assessments, two home based case managers recommended unsupervised visitation, within six months of the visits commencing.

36. At the fourth Permanency Hearing of December 11, 2012, the permanency plan was changed to adoption, with the CHINS Court finding that [Mother] had been offered services to reunify with the children but she had made minimal progress, and the case had been pending for over two years.

37. In the eighteen to twenty family sessions, Clinician Earl failed to see any progress in the formation [of] an appropriate bond and observed that there did not exist a healthy attachment between the girls and their mother.

38. Clinician Earl believed that it would be harmful to the children if their bond with the foster parents was broken, and could result in significant stress, fear, increased behavior problems, and grieving. Further, a long term effect on the ability to trust, and the ability to form healthy relationships could result.

39. Clinician Earl believed that it would be in the children's best interests to remain in their home and benefit from permanency in the safe, stable and secure home where they have been for two years.

40. Therapist Hood believed the children would be affected negatively if removed from the foster home at the time of the bonding assessment.

Appellant's App. pp. 26-28.

The trial court concluded both that continuation of the parent-child relationship poses a threat to the children's well-being, and there is a reasonable probability that

5

conditions keeping the children from reunification will not be remedied. The court noted that Mother's recent and consistent participation in services was "admirable, but the Court finds weight in the opinions of long time clinician Amy Earl and bonding assessor Gloria Hood that there really has been little to no progress in parenting or secure bonding." Id. at 29. The court also stated that "it would be harmful for the children now and in the future if they were removed [from the foster parents] and not allowed to enjoy permanency through adoption" because the children have been placed with the foster parents for two and one-half years after Mother abandoned them. Id. The court observed that it "is unknown how long, if ever, it will take [Mother] to be able to safely parent." Id. The trial court also found that termination of Mother's parental rights was in the children's best interests and that adoption was a satisfactory plan for the future care and treatment of the children. Mother now appeals.

**Standard of Review**

When we review a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re P.P., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's and Father's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific

6

findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

**Discussion and Decision**

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. In the Matter of Termination of the Parent Child Relationship of K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

7

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B)-(D). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Bester, 839 N.E.2d at 148. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. Id. Finally, "if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

Mother argues that the DCS failed to prove 1) that there is a reasonable probability that the reasons for placing the children outside of her home will not be remedied; and 2) that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the children. Mother argues that the evidence the DCS presented to establish those factors was simply speculative and there is no evidence that would support the conclusion that returning the children to Mother would cause them emotional or physical harm.

8

## I. Indiana Code section 31-15-2-4(b)(2)(B)

Indiana Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Mother's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether DCS proved by clear and convincing evidence that there is a reasonable probability that the conditions leading to the removal and continued placement of D.C. and A.R. outside of Mother's care will not be remedied.

To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing and take into consideration evidence of changed conditions. In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied. However, the trial court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id. The trial court may also properly consider, as evidence of whether conditions will be remedied, the services offered to the parent by DCS, and the parent's response to those services. A.F. v. Marion County Office of Family and Children, 762 N.E.2d 1244, 1252 (Ind. Ct. App. 2002), trans. denied. DCS need not rule out all possibilities of change; rather, it must establish only a reasonable probability that the parent's behavior will not change. In re Kay.L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

9

On November 1, 2010, one-year-old A.R. and two-year-old D.C. were removed from Mother because she abandoned them to a friend who became unable to care for them. Prior to abandoning the children completely, Mother often left them with this friend for extended periods of time. Also, Mother has two older children: one who lives with a relative who has guardianship of the child and one who was removed from Mother in 2007 due to allegations of abuse and an unsafe home. Mother consented to the termination of her parental rights to that child, who has been adopted by the child's great aunt and uncle.

After abandoning A.R. and D.C. in November of 2010, Mother could not be located for months. Mother finally began participating in the CHINS action 15 months later, in March 2012. Mother's participation in services was consistent and she rarely missed her weekly, supervised visitation with the children. However, the DCS presented evidence that Mother lacked empathy toward others, and her response to the services was minimal. Mother could not understand the need to reestablish a bond with the children and was either unwilling or unable to work toward forming that bond. DCS service providers observed that Mother and the children did not have a healthy attachment to each other. Mother could not understand the impact of her absences from the children's lives and refused to take responsibility for abandoning the children.

Moreover, Mother's relationships with the children's father and her ex-husband were abusive, but Mother minimized the abuse and failed to complete domestic violence classes. Mother was also abused by her own parents, and her father was imprisoned for sexually abusing her, yet Mother continues to insist that her father did not molest her.

10

Mother also has mental illnesses, including bi-polar disorder and schizophrenia, but she is not under the care of a medical doctor.

Although Mother had a stable home and support system on the date of the termination hearing, her history of abandoning her children, her refusal to address her abusive relationships, her lack of progress after participating in DCS services, and her untreated mental illnesses support the trial court's conclusion that the conditions justifying D.C. and A.R.'s continued placement outside Mother's home will not be remedied. Mother's argument to the contrary is simply a request to reweigh the evidence and the credibility of the witnesses, which we will not do.

## II. Best Interests of the Children

Finally, we consider Mother's claim that the DCS failed to present clear and convincing evidence that termination of her parental rights was in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Moreover, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. We have previously held that the recommendations of the service providers to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

11

D.C. and A.R. have been placed in the same foster home since November 2010. The children are bonded and attached to their foster family, and the foster parents plan to adopt the children.

Mother has not been able to provide the children with the secure and stable home environment that they need. The children do not feel safe with Mother, and D.C. exhibits anxiety regarding Mother. Further, Mother lacks interest in the children's daily lives and during visitations only engages in superficial conversations with the children. Perhaps most importantly, as we stated above, the children are not bonded to Mother, and Mother fails to understand the magnitude of the impact of her absences from the children's lives. Finally, the guardian ad litem and the children's therapist testified that terminating Mother's parental rights was in D.C.'s and A.R.'s best interests. Tr. pp. 109, 232. For all of these reasons, we conclude that the DCS presented clear and convincing evidence that termination of Mother's parental rights was in the children's best interests.

## Conclusion

We will reverse a termination of parental rights only upon a showing of clear error, that is, that which leave us with a definite and firm conviction that a mistake has been made. See In re L.B., 889 N.E. 326, 342 (Ind. Ct. App. 2008). We find no such error in this case. Accordingly, we affirm the trial court's judgment terminating Mother's parental rights to D.C. and A.R.

Affirmed.

BRADFORD, J., and PYLE, J., concur.

12